# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PAUL SCHENK AND
GAIL SCHENK
4086 Sondy Road
P.O. Box 966
Snowflake, AZ 85937

        PLAINTIFFS,

   v.

NOVARTIS PHARMACEUTICALS
CORPORATION
1 Health Plaza
East Hanover, NJ 07936

        DEFENDANT.

Case No. _____

JURY DEMANDED

## COMPLAINT AND JURY DEMAND

NOW COME plaintiffs Paul Schenk ("Mr. Schenk") and Gail Schenk ("Mrs. Schenk") (collectively "Plaintiffs"), by and through counsel, and hereby sue the Defendant, Novartis Pharmaceuticals Corporation ("Novartis" or "Defendant"), a Delaware corporation with principal offices located at 1 Health Plaza, East Hanover, New Jersey, 07936-1080 and for their cause of action state:

## I.      INTRODUCTION

1.      The drugs Aredia® and Zometa®, each produced and marketed by Novartis and other related Novartis entities, each cause and precipitate

osteonecrosis of the jaw, mandible or maxilla bone among patients taking those drugs. Osteonecrosis is bone death of an area of the bone. Osteonecrosis of the jaw is a permanently disfiguring and extremely painful condition, and can result in the complete loss of the patient's jaw bone. Plaintiff Mr. Schenk in this action was infused with Aredia®, and has suffered osteonecrosis of the jaw bone.

## II.   PARTIES

### A.   PLAINTIFF

2.      Plaintiff Paul Schenk is a citizen and resident of the State of Arizona, residing in Snowflake, Arizona. He was prescribed, purchased, and was infused with Aredia®, and as a result thereof suffered severe osteonecrosis of the jaw, including pain, infection, and disfigurement. As is the case with all patients suffering from this condition, Mr. Schenk is at risk for needing invasive procedures or surgeries in the future should his condition require it or should it deteriorate further.

3.      Plaintiff, Gail Schenk, is the wife of Plaintiff Paul Schenk. Mrs. Schenk resides with her husband and is a citizen and resident of the State of Arizona, residing in Snowflake, Arizona.

## B.   DEFENDANT

4.      Defendant Novartis is a Delaware corporation with its corporate headquarters located at 1 Health Plaza, East Hanover, New Jersey, 07936-1080.

5.      At all times relevant hereto, Novartis was engaged in the business of marketing, distributing, promoting, testing, labeling and selling the drugs Aredia® and Zometa®. Novartis, at present or in the past, markets and distributes Aredia® and Zometa® throughout the world, including all fifty states in the United States, and throughout Arizona.

## III.   JURISDICTION AND VENUE

6.      This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000 exclusive of interest and costs, and because this is an action by individual Plaintiffs who are citizens of a different state from the Defendant. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and 1391(c).

## IV.   FACTUAL BACKGROUND

7.      Aredia® and Zometa® are classified as bisphosphonates and are prescribed for the management of metastatic disease to the bone and other bone diseases and conditions. Zometa® is Novartis's "successor" drug to Aredia®, as Aredia® was the first generation version of the drug Zometa®. Zometa® is now

3

marketed by Novartis for all or almost all of the uses for which it previously

marketed Aredia®.   Aredia® and Zometa® have been approved by the United States

Food and Drug Administration.

8.       There are two classes of bisphosphonates: the N-containing

(nitrogenous) and non-N-containing (non-nitrogenous) bisphosphonates. The

nitrogenous bisphosphonates include the following: pamidronate (Aredia®);

zoledronic acid or zoledronate (Zometa®); ibandronate (Bondronat®); risedronate

sodium (Actonel®); and alendronate (Fosamax®). The non-nitrogenous

bisphosphonates include the following: etridronate (Didronel®); clodronate

(Bonefos® and Loron®); and tiludronate (Skelid®).   Aredia® and Zometa® contain a

nitrogen atom, whereas etridonate, clodronate, and tiludronate do not.

9.       Studies and medical practices report the frequent and common

occurrence of osteonecrosis of the jaw in the users of the nitrogenous

bisphosphonates, including Aredia® and Zometa®.

10.       Novartis knew or should have known of the disease phosphorus

necrosis of the jaw or "phossy jaw," which appeared in the 1800s in persons mining

white phosphorus and persons working in white phosphorus match factories.

Phossy jaw had been nearly eliminated in the last century through industrial

hygiene.  The operation of the active ingredients in both Aredia® and Zometa® acts

and has the same effect as the phosphorus byproducts that caused "phossy jaw." It was foreseeable that any drug with the characteristics of Aredia® and Zometa® would carry the risk of a "phossy jaw"-like reaction.

11.     The process by which old bone is taken away and new bone is created is called "remodeling." Both Aredia® and Zometa® were designed specifically to affect the "remodeling" process. Medical science knew, and therefore Novartis knew or should have known, that the jaw operates differently from other bones in the body in that it is subject to unique stresses, and accordingly "remodels" at a far, far greater rate than other bones in the body. Medical science knew, and therefore Novartis knew or should have known, that bisphosphonate drugs had a "site preference" for high remodeling areas, and therefore would have a heightened effect on bones that remodel at a higher rate. Despite this knowledge not one dentist, maxillofacial surgeon, or other jaw or mouth bone specialist was used or assigned to any clinical trial done by Novartis for either Aredia® or Zometa®. This failure constituted a design flaw in every clinical trial and tainted all information provided to the FDA, other regulatory authorities, and peer reviewed journals. Nonetheless, despite any intention of examining the jaw or mouth and without utilization of any oral specialists in the clinical trials, Novartis's data captured at

5

least six persons who self-reported ONJ-like symptoms in the Zometa® clinical trials. Novartis failed properly to report this to the FDA as part of Novartis's application for approval to market the drug, and further failed to report other adverse event reports to the FDA in a timely manner.

12.     Novartis knew and or should have known that bisphosphonates, including Aredia® and Zometa®, inhibit the activity of osteoclasts in the bone. Similarly, Novartis knew or should have known that bisphosphonates cause changes specific to patients' mandibles (lower jaws) and maxillae (upper jaws) and that these changes appear to be cumulative in nature.

13.     Novartis also knew or should have known that these factors can progress to jaw necrosis (bone death) and osteomyelitis (inflammation of bone marrow).

14.     On information and belief, in the year 2002 or before, Novartis was notified by one physician that he had dozens of cases in which patients taking Aredia® had experienced problems so severe that they had lost portions of their jaws. Other oral surgeons during that time frame and before had been reporting such problems to Novartis. On information and belief, Novartis had similar information as to adverse effects caused by its drug Zometa®, which has similar properties and effects as Aredia® and is marketed by Novartis as a more effective

replacement for Aredia®. Nevertheless, Novartis did not undertake to advise

physicians, notify the consuming public or place information about the possibility

of suffering osteonecrosis of the jaw on their products until September of 2004.

Novartis did not undertake to notify dental professionals until May of 2005. These

efforts to date by Novartis to provide notice are not adequate to provide the public

and health care professionals with the information needed to understand the risks

inherent in the use of Aredia® and Zometa®, and indeed are themselves false and

misleading.

15.    Shortly after Novartis began selling Zometa®, reports of osteonecrosis

of the jaw and other dental complications among users further exploded, indicating

that Zometa® shared the class effects of the other nitrogenous bisphosphonates

including Aredia®. Despite this knowledge, Novartis failed to implement further

study of the risk of osteonecrosis of the jaw relative to Zometa® and Aredia®.

Rather than evaluating and verifying the safety of Zometa® with respect to

osteonecrosis of the jaw, Novartis proposed further uses of Zometa®, notably for

osteoporosis under the names Reclast® or Aclasta® or other names, and upon

information and belief, urged off-label uses on medical practitioners. Indeed,

hundreds of articles have been written by qualified medical professionals and

institutions and published in the top medical journals in the world demonstrating that Aredia® causes osteonecrosis of the jaw at a significant rate, and that Zometa® causes osteonecrosis of the jaw at an even higher rate.

16.     Rather than warn patients and the medical community, and despite knowledge by Novartis of increased risk of osteonecrosis of the jaw in patients using Zometa®, Novartis continued and continues to defend and aggressively market Zometa®, while downplaying any unfavorable findings and overstating its benefits.  This includes attempting to have it approved for use in the treatment of osteoporosis, and in seeking approval to market the drug for osteoporosis changing the name of the drug to "Reclast®" or "Aclasta®" or other names in order to conceal the link between the drug and osteonecrosis of the jaw.

17.     Because of the long "half-life" of the drugs Aredia® and Zometa® in the body, the drug remains in the bones of persons who have been infused with it for at least many, many years or even permanently.  For this reason, onset of osteonecrosis of the jaw or worsening of a patient's condition can occur years after infusions of the drug have been discontinued.  For this reason, the label indications that call for an infusion of the drug every three-four weeks in perpetuity constitute an overdose.

18.     Despite knowledge of the specific risk, Novartis have failed timely to

initiate studies to further investigate risks associated with the use of Aredia® and

Zometa®.

19.     Further, Novartis had a duty fully to test and evaluate Aredia® and

Zometa® prior to their introduction to the market, to ensure that the drugs were safe

to use for their intended purpose.  Novartis failed to satisfy this duty.

20.     Upon information and belief Novartis' Safety Reporting System (also

known as "STL") generated errors and affected the reporting of safety data to the

FDA and negatively impacted clinical trials.  To date the system is obsolete and still

generating inaccurate safety data that is being submitted to the FDA.

21.     Novartis failed properly to conduct "dosing studies" to ascertain the

minimum effective quantities of the drugs Aredia® and Zometa®, and thereby to

establish the proper quantities of the drugs to be administered to patients and the

proper number of infusions which patients should receive.  Identifying the

minimum effective dosage and setting the dosage instructions accordingly are

critical to avoiding the occurrence of side effects.  Novartis, to maximize profit, for

most or all label indications specified a dosage and dosing schedule of Zometa® far

above any indicated for palliative effect.  This dosing schedule, for most

indications, calls for an infusion of the drug every three to four weeks *forever*,

without any end point or time at which the use of the drug should be discontinued.

As a result of Novartis's failure to instruct as to the proper dosage, upon information and belief the amount of the drug actually administered to Plaintiff constituted an overdose, and contributed to the side effects and harm he suffered.

## COUNT I
## STRICT LIABILITY

22.     Plaintiffs repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:

23.     The Defendant was engaged in the business of manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising and otherwise distributing Aredia® in interstate commerce, which it sold and distributed throughout the world, including the State of Arizona.

24.     Mr. Schenk was using Aredia® in the manner for which it was intended, or in a reasonably foreseeable manner.

25.     Aredia® was expected to and did reach Mr. Schenk without substantial change in its condition as manufactured, created, designed, tested, labeled, sterilized, packaged, supplied, marketed, sold, advertised and otherwise distributed.

26.     Mr. Schenk was not aware of, and reasonably could not have discovered, the actual dangerous nature of Aredia®.

27.     Aredia® causes increased risks of osteonecrosis of the jaw upon consumption, and therefore constitutes a product unreasonably dangerous for

normal use due to its defective design, defective manufacture, and the Defendant's

misrepresentations and inadequate facts disclosed to Mr. Schenk and his health care

providers including, *inter alia*, the actual risk of developing osteonecrosis of the

jaw and the permanent, irreversible harm associated with this disease.

28.     As a direct and proximate result of Defendant's manufacturing,

creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing,

selling, advertising, and otherwise distributing Aredia® in interstate commerce, Mr.

Schenk has suffered osteonecrosis of the jaw, and is at an increased risk of

developing other diseases and conditions.

29.     The Defendant, therefore, is strictly liable to Mr. Schenk and Mr.

Schenk is entitled to compensatory damages.  Additionally, Defendant's conduct

was so outrageous as to constitute ill will, bad motive and reckless indifference to

the interests of the consumers.  Mr. Schenk therefore is entitled to punitive damages

in an amount to be proven at trial.

## COUNT II
## NEGLIGENCE - NEGLIGENT MANUFACTURE

30.     Plaintiffs repeat and reallege, as if fully set forth herein, each and

every allegation contained in the above paragraphs and further allege:

31.     It was the duty of the Defendant to use reasonable care in the

manufacturing, creating, designing, testing, sterilizing, packaging, supplying, and

otherwise distributing Aredia®.

32.     Contrary to its duty, the Defendant failed:  adequately and properly to test and inspect Aredia® so as to ascertain whether or not it was safe and proper for the purpose for which it was designed, manufactured and sold; adequately and properly to conduct a dosing study or otherwise to test Aredia® to ascertain the minimum effective dosage and to use this information to instruct users of the drug and/or their health care providers of the proper dosage so as to minimize the risk of development of osteonecrosis of jaw or other side effects; to utilize and/or implement a reasonably safe design in the manufacture of Aredia®; to manufacture Aredia® in a reasonably safe condition appropriate for the use for which it was intended.

33.     Defendant manufactured and sold Aredia®, which as constituted is and was a hazard to Plaintiff's health.  Defendant's manufacture and sale of Aredia® as constituted caused Mr. Schenk to suffer adverse side effects and disease.

34.     Defendant was otherwise careless and negligent.

35.     As a direct and proximate result of Defendant's negligent, reckless, and careless manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, and otherwise distributing Aredia® in interstate commerce, Mr. Schenk has suffered osteonecrosis of the jaw,

is at an increased risk of developing other diseases and conditions, and has suffered

compensatory damages and is entitled to punitive damages in amounts to be proven

at trial.

**COUNT III**
**NEGLIENCE – FAILURE TO WARN**

36.     Plaintiffs repeat and reallege, as if fully set forth herein, each and

every allegation contained in the above paragraphs and further allege:

37.     It was the duty of the Defendant to use reasonable care in the labeling,

marketing, selling, advertising, and promoting of Aredia®, and to warn Mr. Schenk

and his medical providers of the true risk of osteonecrosis of the jaw and other side

effects when using Defendant's drug.

38.     Contrary to its duty, the Defendant failed:  adequately and properly to

warn Mr. Schenk of the risks of serious complications and bodily harm when

Aredia® is used in the manner for which it was intended; adequately and properly to

warn Mr. Schenk of the risks of diseases when Aredia® is used in a manner for

which it was intended; adequately and properly to label Aredia® so as to warn Mr.

Schenk of the risks of complications and disease; and adequately and properly to

label Aredia® so as to warn Mr. Schenk of the risks of osteonecrosis of the jaw.

39.     Further, Defendant failed to meet the standard of care set by the

Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq., related

13

amendments and codes and federal regulations provided thereunder, the Sherman

Food, Drug and Cosmetic Law, and other applicable laws, statutes and regulations.

Defendant further failed in the following respects:

      a.      The labeling lacked adequate information on the use of the drug Aredia® (21 C.F.R. Section 201.56(a) and (d));

      b.      The labeling failed to provide adequate warnings of severe and disabling medical conditions including, without limitation, osteonecrosis of the jaw, and other adverse medical conditions as soon as there was reasonable evidence of their association with the drug (21 C.F.R. 201.57(e));

      c.      There was inadequate information for patients for the safe and effective use of Defendant's drug (21 C.F.R 201.57(f)(2));

      d.      There was inadequate information regarding special care to be exercised by Mr. Schenk's doctors for safe and effective use of Defendant's drug (21 C.F.R. 201.57(f)(1));

      e.      The labeling was misleading and promotional (21 C.F.R. 201.56(b)); and

      f.      Defendant's acts constitute an adulteration and/or misbranding as defined by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 331.

40.      Defendant's product Aredia® was unaccompanied by proper and

adequate warnings regarding the risk of osteonecrosis of the jaw associated with the

use of Defendant's product and the scope, severity and duration of such injuries.

41.      Despite Defendant's failure to provide adequate warnings to protect

users or consumers of Aredia®, Defendant nevertheless continued aggressively to

market, promote, distribute, and sell the dangerously defective product.

42.     As a result of Defendant's negligence and the violations of the statutes and regulations listed above, Mr. Schenk suffered injuries and damages as alleged herein.

43.     As a direct and proximate result of Defendant's failure to warn, Mr. Schenk has developed osteonecrosis of the jaw, is at risk of developing other diseases, and has suffered compensatory damages and is entitled to punitive damages in amounts to be proven at trial.

## COUNT IV
## BREACH OF EXPRESS WARRANTY

44.     Plaintiffs repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:.

45.     Defendant expressly warranted to Mr. Schenk, by and through statements made by Defendant or their authorized agents or sales representative, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that Aredia® was safe, effective, fit and proper for its intended use.

46.     In using Aredia®, Mr. Schenk and his health care providers relied on the skill, judgment, representations and foregoing express warranties of the Defendant.  Said warranties and representations were false in that the aforementioned product was not safe and was unfit for the uses for which it was

intended.

47.     As a direct and proximate result of Defendant's breaches of warranties, Mr. Schenk has developed osteonecrosis of the jaw, is at risk of developing other diseases, and has suffered compensatory damages and is entitled to punitive damages in amounts to be proven at trial.

## COUNT V
## BREACH OF IMPLIED WARRANTY

48.     Plaintiffs repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:

49.     Prior to the time that Aredia® was used by Mr. Schenk, Defendant impliedly warranted to Mr. Schenk that Aredia® was of merchantable quality and safe and fit for the use for which it was intended.  Mr. Schenk is unskilled in the research, design and manufacture of Aredia®, and reasonably relied on the skill, judgment and implied warranty of the Defendant in using Aredia®.

50.     Aredia® was neither safe for its intended use nor of merchantable quality, as warranted by Defendant, in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user.

51.     As a direct and proximate result of Defendant's breaches of warranties, Mr. Schenk has developed osteonecrosis of the jaw, is at risk of developing other diseases, and has suffered compensatory damages and is entitled to punitive

damages in amounts to be proven at trial.

## COUNT VI
## LOSS OF CONSORTIUM

41.    Plaintiffs repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:

42.    As a proximate cause of Defendant's wrongful conduct resulting in the injuries Plaintiffs have suffered as described herein, Mrs. Schenk has lost the spousal consortium of Mr. Schenk.  She will likely continue to lose her spouse's consortium in the future due to the Defendant's wrongful conduct.

43.    Accordingly, Mrs. Schenk has suffered compensatory damages in an amount to be proven at trial.  Mrs. Schenk hereby avers that the acts committed by Defendant, and its willful and wanton acts and legal malice constitute aggravating factors which support an award of punitive damages.

WHEREFORE, Plaintiffs pray that this honorable Court enter judgment against Novartis, and in favor of the Plaintiffs, and to award the following relief:

a.    Award Mr. Schenk all damages allowed by law to compensate him for the physical injury, pain, suffering, emotional distress, mental anguish, physical disability and physical disfigurement and other losses which he has endured;

b.    Award Mr. Schenk damages equal to the amount of his medical and health care costs and expenses incurred to present and in the future;

c.    Award Mr. Schenk damages in an amount sufficient to compensate hi,

for the likely future deterioration of his medical condition as a result of the harm he has suffered from use of Defendant's product;

d.      Award Plaintiffs damages equal to any amount of lost wages and earnings;

e.      Award Plaintiffs punitive/exemplary damages to the extent necessary and appropriate to punish and deter the conduct complained of herein;

f.      Award Mrs. Schenk damages for loss of companionship and consortium with her spouse;

g.      Award Plaintiffs attorneys' fees and costs, plus interest, as allowed by law; and

h.      Award Plaintiffs such other and further legal and equitable relief as this honorable Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of this action.


VALAD & VECCHIONE, PLLC


Bart T. Valad, Esq. (DC Bar No. 462814)
John J. Vecchione, Esq. (DC Bar No. 431764)
VALAD AND VECCHIONE, PLLC
3863 Plaza Drive
Fairfax, Virginia  22030
Telephone:  (703) 352-4800
Fax:  (703) 352-4820

*Attorneys for Plaintiffs Paul and Gail Schenk*

Dated:  September 4, 2007