John J. Vecchione, Esq. (admitted *pro hac vice*)
John J. Vecchione Law, PLLC
3863 Plaza Drive
Fairfax, Virginia 22030
Telephone: (703) 352-4800
Facsimile: (703) 352-4820
jvecchione@valadlaw.com

-with-

Martin H. Mathers, Esq.
Martin H. Mathers PC
3101 N. Central Ave., Ste. 970
Phoenix, Arizona 85012
Telephone: (602) 258-0646
Facsimile: (602) 258-8287
mathers@gmazlaw.com

*Counsel for Plaintiffs*
*Paul and Gail Schenk*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **PAUL SCHENK,** *et al.*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>**NOVARTIS PHARMACEUTICALS CORPORATION,**<br><br>    *Defendant*. | **Case No. 3:12-cv-08223-NVW**<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTIONS TO EXCLUDE THE CASE-WIDE OPINIONS OF DRS. ROBERT MARX, SUZANNE PARISIAN, AND JAMES VOGEL** |

Plaintiffs, Paul Schenk and Gail Schenk, through their attorneys, hereby oppose

Defendant's, Novartis Pharmaceuticals Corporation ("Novartis" or "NPC"), *Daubert*

motions to exclude the case-wide opinions of Plaintiffs' oral/maxillofacial expert Dr. Robert

E. Marx, D.D.S. ("Dr. Marx"), FDA expert Dr. Suzanne Parisian, M.D. ("Dr. Parisian"), and

oncologic exert Dr. James E. Vogel, M.D. ("Dr. Vogel").

## I.    PRELIMINARY STATEMENT

As is its want in this Aredia and Zometa litigation, Novartis has again filed motions seeking to have Plaintiffs' case-wide experts Dr. Marx, Dr. Parisian, and Dr. Vogel excluded.  Though NPC has moved against these same experts from testifying based on the same expert reports in these Bisphosphonate-Related Osteonecrosis of the Jaw ("BRONJ") cases literally dozens of times, exactly zero courts have excluded Dr. Marx and Dr. Vogel. In fact, NPC admits in its moving papers (as it must) that it is law-of-the case that Dr. Marx's and Dr. Vogel's opinions pass *Daubert*.  *See In re: Aredia and Zometa Prods. Liab. Litig.*, No. 3:06-md-1760, Docket No. 2814 (M.D. Tenn. Aug. 13, 2009) (**Dr. Marx approved by the MDL court under *Daubert* to testify on the causal connection between Aredia and Zometa and ONJ, and treatment and preventative measures for ONJ**) (attached as Exhibit 1) *and In re: Aredia and Zometa Prods. Liab. Litig.*, No. 3:06-md-1760, Docket No. 2811 (M.D. Tenn. Aug. 13, 2009) (**Dr. Vogel approved by the MDL court under *Daubert* to testify on general causation and the scientific and medical accuracy of the warnings given by Novartis**) (attached as Exhibit 2)[1].  With regard to Dr. Parisian, the single instance where she did not testify arose simply because the plaintiff in that one case agreed FDA regulations were not at issue in the case—a situation which does not pertain here.

Plaintiffs' case-wide expert opinions have consistently been admitted under *Daubert*, with certain topics objected to by Novartis being excluded at the margins (usually because plaintiff never actually intended to offer such opinions in the first place).  *See, e.g.,* Section on Marx's "bad faith" opinions, *infra*.  Further, though Novartis always claims that

---

[1] The MDL court underscored these decisions in an Order intended to guide remand courts trying cases from the MDL.  *See In re: Aredia and Zometa Prods. Liab. Litig.*, No. 3.06-MD-1760, 2011 WL 2182824, at *6 (M.D. Tenn. Jun. 3, 2011).

Plaintiffs' case-wide experts must be excluded under *Daubert*, on appeals from plaintiff's verdicts Novartis has never ascribed error to any court's case-wide *Daubert* rulings. In the *Fussman* case, the first Aredia/Zometa case to be tried in Federal District Court, all such rulings have now been affirmed by denial of Defendant's appeal. *See Fussman v. Novartis Pharms. Corp.*, No. 1:06-cv-0149, 2011 WL 5836928 (M.D.N.C. Nov. 21, 2011), *aff'd*, 509 Fed. Appx. 215 (4th Cir. 2013), *cert. denied*, 134 S.Ct. 88, 187 L.Ed.2d 32 (2013 WL 1935287) (Oct. 7, 2013) (both Drs. Marx and Parisian testified at the *Fussman* trial).

By continuing to make these same *Daubert* motions Novartis is, at best, trying its hand at getting a different ruling from a different court. At worst, Novartis is following through with an intentionally wasteful litigation tactic. For example one of the first (and perhaps most comprehensive) opinions on NPC's *Daubert* motions was penned by Judge Spatt in the *Deutsch* and *Forman/Napolitano* cases. *See Deutsch v. Novartis Pharms. Corp.*, 768 F.Supp.2d 420 (E.D.N.Y. Mar. 8, 2011). Regarding Drs. Marx and Vogel, Judge Spatt noted that the MDL court's rulings were law of the case. 768 F.Supp.2d at 427-29. NPC's arguments would only be addressed to the extent they did not undermine and were not inconsistent with the prior MDL rulings. 768 F.Supp.2d at 434. Judge Spatt did feel the need to hold a *Daubert* hearing on Dr. Parisian because her opinions were not previously substantively ruled upon by the MDL court. NPC managed to stretch that hearing out for two days, after which Judge Spatt admitted Dr. Parisian's opinions. *See Forman/Napolitano v. Novartis Pharms. Corp.*, No. 2:09-cv-4678, 2011 WL 2516527 (E.D.N.Y. Jun. 22, 2011). Yet, despite those clear and unequivocal opinions, NPC refiled its *Daubert* motions again in front of Judge Spatt when the opportunity presented itself. *See Davids v. Novartis Pharms. Corp.*, 857 F.Supp.2d 267 (E.D.N.Y. Apr. 19, 2012). Judge Spatt noted: "Despite the clear, definitive ruling by both this Court and the MDL court, Novartis again moves to exclude the

expert testimony in whole or in part of the ... case-wide experts". *Id.* at 275.  Further, it was not apparent to Judge Spatt what "considerable pains" NPC undertook to differentiate its motions. *Id.* at 276.

This is precisely what NPC is doing (again) here.  Despite the sea of authority against it, Novartis files these motions without revealing to the Court an accurate picture of the record over this years-long litigation, a record which shows that Novartis has, in the main, lost these motions time and time and time again.  *See, e.g., Chiles v. Novartis Pharms. Corp.*, No. 3:06-cv-0096, 2013 WL 5769903 at *3 (M.D. Fla. Feb. 7, 2013) ("Many of Defendants' motions presently before the Court include arguments soundly rejected by the MDL Court").  Such attempts by a billion dollar company to continuously re-litigate well settled issues should not be condoned by the Court.  NPC's motions should be denied.

## II.      FACTS

It is important to know from the outset the structure and history of the Aredia/Zometa litigation.  This case has been remanded from a Multidistrict Litigation styled *In re: Aredia and Zometa Products Liability Litigation*, No. 3:06-MD-1760 (M.D. Tenn.) ("MDL-1760").  The MDL-1760 plaintiffs all allege that NPC's bisphosphonate drugs Aredia and Zometa caused them to suffer from a new and devastating type of jaw disease: Bisphosphonate-Related Osteonecrosis of the Jaw.  The cases in MDL-1760 were consolidated for coordinated discovery and pretrial proceedings.  As a result the record of MDL-1760 is vast and well developed.  In fact, the MDL-1760 court itself felt the need to summarize the history of the proceedings in an Opinion intended to help guide courts receiving remanded Aredia/Zometa cases.  *See In re: Aredia and Zometa Prods. Liab. Litig.*, 2011 WL 2182824.

Individual cases in MDL-1760 have progressed by being grouped into "Waves" for work up ("Wave I-A", "Wave I-B", "Wave I-C", "Wave II", "Wave III", "Wave IV", "Wave

4

V", etc.).  Dr. Marx, Dr. Parisian and Dr. Vogel have each been named since Wave I-A as "case-wide" experts, meaning their proposed testimony relates solely to issues that concern the litigation as a whole (such as causation, the adequacy of NPC's warnings, labeling, FDA issues, etc.).  They do not discuss any "case-specific" facts that relate only to one individual's case.  In short, a case-wide expert's testimony applies to all cases.  Thus, a ruling on the admissibility of a case-wide expert's testimony should have global effects and be enforced globally.

On June 1, 2009, in Wave I-A, NPC first moved under *Daubert* to exclude Plaintiffs' case-wide experts.  The matters were fully briefed, and the MDL court ultimately ruled that the testimony of Dr. Marx and Dr. Vogel was reliable and admissible.  *See* Ex. 1; Ex. 2; *In re: Aredia and Zometa Prods. Liab. Litig.*, 2011 WL 2182824 at \*5-\*6.  The testimony of Plaintiffs' other case-wide experts (such as Dr. Parisian) was "mooted" for the purposes of summary judgment.  But it is clear from the MDL court's denials of summary judgment based on general causation and warning that these experts were generally approved by that Court.  *See Chiles*, 2013 WL 539891 at fn. 9.

Subsequently, NPC has filed virtually identical motions under *Daubert* to exclude Plaintiffs' case-wide experts in Wave I-B, Wave I-C, Wave II, and Wave III.  This includes moving again, repeatedly, against Drs. Marx and Vogel.  Yet Novartis does not tell the Court any of this or the outcome of these cases and mischaracterizes the MDL rulings so as to get a second bite at the apple.  These facts alone should be sufficient to deny NPC's motions, yet this is just the beginning of the history of NPC's abusive motion practice.

Not all of the Aredia/Zometa BRONJ cases pending against Novartis are in MDL-1760.  The *Stevens* case was filed in Montana state court which, for procedural reasons, remained in that jurisdiction.  A parallel mass tort containing about 140 cases is also

currently pending in New Jersey state court. *See In re: Zometa / Aredia Litigation*, No. 278-MT (N.J. Super. Ct. Law Div. Middlesex County). The first New Jersey mass tort case to be worked up for trial was the *Bessemer* case. NPC saw fit to move against Plaintiffs' case-wide experts in both *Stevens* and *Bessemer*. It failed on virtually every front. *See Stevens* Orders on Dr. Marx and Dr. Parisian (attached as Exhibits 3 and 4, respectively); and *Bessemer* Orders on Dr. Marx, Dr. Parisian, and Dr. Vogel (attached as Exhibits 5, 6, and 7, respectively). Novartis did not appeal the rulings in the *Stevens* case even though it went as far as to seek *certiorari* to the Supreme Court of the United States in that case after it lost at trial. *See Stevens v. Novartis Pharms. Corp.*, 358 Mont. 474, 247 P.3d 244 (Mont. 2010), *cert. denied*, 131 S.Ct. 2938 (May 31, 2011).

Subsequently in *every case remanded from MDL-1760 NPC has re-filed or renewed Daubert motions against Plaintiffs' case-wide experts*. Novartis is clearly seeking to burden Plaintiffs' case-wide experts—vetted by the MDL and subsequently by numerous district courts—with a potential hearing in every single remanded case. Nothing could be more calculated to undermine both the MDL process and finality of litigation—not to mention Fed. R. Civ. P. 1. NPC has chosen this tactic in clear disregard for the mountain of authority that has accumulated largely admitting Plaintiffs' case-wide expert testimony (though certain topics have been precluded from time to time often with *plaintiff's acquiescence*). Usually, for most experts, no *Daubert* hearing is ordered. Indeed, they are unnecessary. *See, e.g., Fussman v. Novartis Pharms. Corp.*, No. 1:06-cv-0149, slip op. (Docket No. 408) (M.D.N.C. Oct. 7, 2010) (attached as Exhibit 8). *And see Deutsch v. Novartis Pharms. Corp.*, 768 F.Supp.2d 420 (E.D.N.Y. Mar. 8, 2011); *Hogan v. Novartis Pharms. Corp.*, No. 06-cv-0260, 2011 WL 1533467 (E.D.N.Y. Apr. 24, 2011); *Forman v. Novartis Pharms. Corp.*, No. 2:09-cv-4678, 2011 WL 2516527 (E.D.N.Y. Jun. 22, 2011);

*Talley v. Novartis Pharms. Corp.*, No. 3:08-cv-0361, 2011 WL 7941938 (W.D.N.C. Jun. 28, 2011); *Kyle/Mahaney v. Novartis Pharms. Corp.*, No. 1:06-cv-0035, slip op. (Docket No. 151) (W.D. Ky. Sept. 12, 2011) (attached as Exhibit 9); *Zimmerman v. Novartis Pharms. Corp.*, No. 8:08-cv-2089, slip op. (Docket No. 93) (D. Md. Nov. 8, 2011) (attached as Exhibit 10); *Kyle/Mahaney v. Novartis Pharms. Corp.*, No. 1:06-cv-0035, slip op. (Docket No. 172) (W.D. Ky. Nov. 15, 2011) (attached as Exhibit 11); *Brown v. Novartis Pharms. Corp.*, No. 7:08-cv-0130, slip op. (Docket No. 159) (E.D.N.C. Jan. 9, 2012) (attached as Exhibit 12); *Brodie v. Novartis Pharms. Corp.*, No. 4:10-cv-0138, slip op. (Docket No. 205) (E.D. Mo. Jan. 20, 2012) (attached as Exhibit 13); *Winter v. Novartis Pharms. Corp.*, No. 06-4049-cv, 2012 WL 827305 (W.D. Mo. Mar. 8, 2012); *Lemons v. Novartis Pharms. Corp.*, No. 3:08-cv-0361, 2012 WL 965977 (W.D.N.C. Mar. 21, 2012); *Davids v. Novartis Pharms. Corp.*, 857 F.Supp.2d 267 (E.D.N.Y. Apr. 19, 2012); *Zimmerman v. Novartis Pharms. Corp.*, No. 8:08-cv-2089, slip op. (Docket No. 180) (D. Md. Sept. 25, 2012) (attached as Exhibit 14); *Georges v. Novartis Pharms. Corp.*, No. 2:06-cv-5207, 2012 WL 9064768 (C.D. Cal. Nov. 2, 2012) (*Daubert* decision on Dr. Marx and Dr. Parisian); *Hill v. Novartis Pharms. Corp.*, No. 1:06-cv-0939, 2012 WL 5451809 (E.D. Cal. Nov. 7, 2012) (*Daubert* decision on Dr. Parisian); *Hill v. Novartis Pharms. Corp.*, No. 1:06-cv-0939, 2012 WL 5451816 (E.D. Cal. Nov. 7, 2012) (*Daubert* decision on Dr. Marx); *Rutz v. Novartis Pharms. Corp.*, No. 3:12-cv-0026, slip op. (Docket No. 126) (S.D. Ill. Dec. 7, 2012) (attached as Exhibit 15); *Jenkins v. Novartis Pharms. Corp.*, No. 3:11-cv-0342, 2012 WL 6213494 (E.D. Tenn. Dec. 13, 2012) (*Daubert* decision on Dr. Marx and Dr. Parisian); *D'Agnese v. Novartis Pharms. Corp.*, No. 2:12-cv-0749, 2013 WL 321773 (D. Ariz. Jan. 28, 2013) (*Daubert* decision on case-wide experts); *Chiles v. Novartis Pharms. Corp.*, No. 3:06-cv-0096, 2013 WL 5769903 (M.D. Fla. Feb. 7, 2013) (*Daubert* decision on Dr. Marx and Dr. Vogel); *Chiles v. Novartis*

*Pharms. Corp.*, No. 3:06-cv-0096, 2013 WL 539891 (M.D. Fla. Feb. 7, 2013) (*Daubert* decision on Dr. Parisian); *D'Agnese, et al. v. Novartis Pharms. Corp.*, No. 2:12-cv-0749, slip op. (Docket No. 154) (D. Ariz. Feb. 28, 2012) (*Daubert* decision on Dr. Vogel) (attached as Exhibit 16); *Jenkins v. Novartis Pharms. Corp.*, No. 3:11-cv-0342, 2013 WL 811766 (E.D. Tenn. Mar. 5, 2013); *Guenther v. Novartis Pharms. Corp.*, No. 6:08-cv-0456, 2013 WL 1277928 (M.D. Fla. Mar. 28, 2013) (*Daubert* decision on Dr. Marx); *Guenther v. Novartis Pharms. Corp.*, No. 6:08-cv-0456, 2013 WL 1278089 (M.D. Fla. Mar. 28, 2013) (*Daubert* decision on Dr. Parisian); *Dopson-Troutt v. Novartis Pharms. Corp.*, No. 8:06-cv-1708, 2013 WL 1344755 (M.D. Fla. Apr. 2, 2013) (*Daubert* decision on Dr. Parisian); *Dopson-Troutt v. Novartis Pharms. Corp.*, No. 8:06-cv-1708, 2013 WL 1339739 (M.D. Fla. Apr. 3, 2013) (*Daubert* decision on Dr. Marx); *Taylor v. Novartis Pharms. Corp.*, No. 0:06-cv-61337, 2013 WL 5118945 (S.D. Fla. Apr. 22, 2013) (*Daubert* decision on Dr. Parisian and Dr. Vogel); *Earp v. Novartis Pharms. Corp.*, No. 5:11-cv-0680, 2013 WL 4854488 (E.D.N.C. Sept. 11, 2013) (*Daubert* decision on case-wide experts); *Mathews v. Novartis Pharms. Corp.*, No. 3:12-cv-0314, 2013 WL 5780415 (S.D. Ohio Oct. 25, 2013) (*Daubert* decision on case-wide experts) (attaching and adopting the court's previous *Daubert* rulings in *Bowles v. Novartis Pharms. Corp.*, No. 3:12-cv-0145, and *Sheffer v. Novartis Pharms. Corp.*, No. 3:12-cv-0238); *Stambolian v. Novartis Pharms. Corp.*, No. 12-cv-4378, 2013 WL 6345566 (C.D. Cal. Dec. 6, 2013) (*Daubert* decision on Dr. Marx and Dr. Parisian); *Rowland v. Novartis Pharms. Corp.*, No. 2:12-cv-1474, 2014 WL 1316351 (W.D. Pa. Mar. 31, 2014) (*Daubert* decision on case-wide experts); *Bartoli v. Novartis Pharms. Corp.*, No. 3:13-cv-0724, 2014 WL 1515870 (M.D. Pa. Apr. 17, 2014) (*Daubert* decision on case-wide experts); *Kruszka v. Novartis Pharms. Corp.*, No. 07-cv-2793, 2014 WL 1878771 (D. Minn. May 12, 2014) (amended May 19, 2014) (*Daubert* decision on Dr. Marx); *Arnold v. Novartis Pharms.*

8

*Corp.*, No. 8:06-cv-1709, 2014 WL 2920501 (M.D. Fla. Jun. 27, 2014) (*Daubert* decision on Dr. Marx); *Arnold v. Novartis Pharms. Corp.*, No. 8:06-cv-1709, slip op. (Docket No. 113) (M.D. Fla. Jun. 27, 2014) (*Daubert* decision on Dr. Vogel) (attached as Exhibit 17); *Kruszka v. Novartis Pharms. Corp.*, No. 07-cv-2793, slip op. (Docket No. 219) (D. Minn. Jul. 1, 2014) (*Daubert* decision on Dr. Vogel and Dr. Parisian) (attached as Exhibit 18); *Monroe v. Novartis Pharms. Corp.*, No. 1:12-cv-0746, slip op. at p. 10-12 (Docket No. 92) (S.D. Ohio Jul. 10, 2014) (*Daubert* decision on Dr. Vogel) (attached as Exhibit 19).

## III.   ARGUMENT

Plaintiffs invite the Court to carefully review the full record of rulings by various courts on NPC's repeat motion practice to exclude the same experts on the same expert reports, over-and-over, *ad infinitem*.  The Court will note the complete absence of any ruling that these witnesses could not testify as to the main substance of their testimony.  To aid the Court in understanding the record, Plaintiffs in this brief will go witness-by-witness and provide the Court with an accounting of the rulings to date regarding these witnesses on the identical expert reports and testimony at issue in this case.

### A.   Dr. Robert E. Marx, D.D.S.

Plaintiffs adopt and incorporate by reference the opposition to NPC's *Daubert* motion to exclude Dr. Marx as filled originally by the Plaintiffs' Steering Committee in the MDL. *See* MDL-1760 Docket No. 2619 (Marx Opposition) (attached as Exhibit 20).  Plaintiffs will not repeat the substantive arguments as laid out in that filing, but attach the opposition without attachments so that the Court can confirm the near identity of arguments made previously.

With regard to Dr. Marx as of this date nearly thirty rulings, including one by the MDL Court in this matter, have been made by various courts admitting his testimony in these

9

cases against Novartis. The Courts in the *Jenkins*, *D'Agnese*, and *Taylor* cases did order additional *Daubert* hearings. After the hearing in *Jenkins* the testimony of both Drs. Marx and Parisian was admitted in the main. *See Jenkins*, 2013 WL 811766. The *D'Agnese* court did not hold Dr. Marx's *Daubert* hearing after the plaintiffs there further explained that, contrary to NPC's claims, they were not offering Dr. Marx on certain topics. In addition, courts in California, Illinois and Florida have recently made similar determinations. *See Georges*; *Rutz*; *Guenther*; *Dopson-Troutt*.

Most of the issues raised in NPC's papers regarding discrete areas of Dr. Marx's testimony have passed *Daubert* muster many times. Defendant has had a full and fair opportunity to litigate the admissibility of Dr. Marx's proffered opinions on pre-treatment dental screenings, cases of BRONJ in the Aredia and Zometa clinical trials, the incidence rate of BRONJ, and the biological mechanism by which the drugs cause BRONJ. The issues were fully briefed in the MDL, the MDL court ruled, and it is law of the case that Dr. Marx is well qualified and can reliably testify regarding "the issues of causal connection and treatment and preventative measures for ONJ." Ex. 1; *In re: Aredia and Zometa Prods. Liab. Litig.*, 2011 WL 2182824 at *6. *And see Deutsch*, 768 F.Supp.2d 420, 436-51 (allowing Dr. Marx's testimony).

Further NPC agrees that preventative measures have proven to reduce the annual incidence of ONJ by 75%. *See* NPC ONJ Flash Card (attached as Exhibit 21) *and* Email from NPC CEO David Epstein to Dr. Steven Lehrer (Jul. 8, 2008) ("Even more importantly we have learned that preventative dental care and oral surgeons who do not aggressively debride the area (an (sic) make it worse as a result) can either dramatically reduce the incidence or limit the severity so that healing is likely...I am very excited that physicians are now doing the necessary dental screenings and that the new therapeutic approaches look like

they will help...") (attached as Exhibit 22).  Indeed, NPC's own documents and the current version of the product label recommend pre-dental screening.  *See* Zometa 2013 Label (attached as Exhibit 23).  This is the approach Dr. Marx has been recommending since 2003.  As the Court said in *Jenkins*, it is hard to see how Novartis can claim Dr. Marx's methods are effective in reducing the risk of BRONJ and then say his opinions are not admissible.  *Jenkins v. Novartis,* 2012 WL 6213494 at *3-*6.

Dr. Marx will not offer testimony as to NPC's state of mind.  In fact, the Plaintiffs never intended for Dr. Marx to offer an opinion on NPC's intent, motive, and "bad faith".  Plaintiffs only intend to elicit factual testimony about Dr. Marx's personal dealings with NPC.  Plaintiffs will present Dr. Marx's personal knowledge on the facts of NPC's actions based on its conduct of which he has first-hand knowledge because Dr. Marx had direct contact with Novartis, and Novartis itself—pre-litigation, of course—retained Dr. Marx as an expert on its ONJ medical advisory panels.

In 2002 Dr. Marx, already a world-renowned oral and maxillofacial surgeon, published a book which contained a section about the rising number of his patients receiving IV bisphosphonates (primarily Aredia) and then suffering from osteonecrosis of the jaw.  Osteonecrosis of the jaw is a condition treated by oral surgeons such as Dr. Marx.  He then approached Novartis, who denied any causal relationship.  Once Novartis could no longer ignore the epidemic of cases reported to them from multiple sources, they brought Dr. Marx on board to advise them on how to deal with the issue.  Novartis chose to ignore his suggestions (and the suggestions of other highly respected oral surgeons) and at these purported "advisory board" meetings offered false and misleading information about the cause of BRONJ.  *See Deutsch*, 768 F.Supp.2d 420, 436.

11

Plainly Dr. Marx's dealings with Novartis and their publication of the "White Paper" make him a unique fact witness. Thus, Novartis' real issue with Dr. Marx arises from his personal knowledge of exactly what they were (and were not) doing, not his offering an opinion on corporate state of mind. *See, e.g., Deutsch v. NPC*, 768 F.Supp.2d 420, 448 (Marx allowed to offer expert opinion on information available based on medical literature and NPC documents, and his experiences of working with NPC); *Davids*, 857 F.Supp.2d 267 (affirming *Deutsch*); *Mathews*, 2013 WL 5780415 at *26. Dr. Marx may testify about his experiences working with Novartis and its employees, and it is for the jury to decide whether Dr. Marx's experiences imply that Novartis was acting in bad faith. *Id.*

Regarding the clinical trials, Dr. Marx will not be offered to provide criticisms of their design (though he may mention the fact that no oral/maxillofacial surgeons were involved in the design of the clinical trials). Instead, Dr. Marx will testify that he obtained and reviewed medical records from certain patients involved in the clinical trials. As he does in his own clinical practice, Dr. Marx reviewed the medical records for these patients in the clinical trials, and concluded that some patients may have had BRONJ. This is entirely within the field of Dr. Marx's expertise, and he arrived at his conclusion following the same procedure he uses in his every day practice. In addition, NPC belatedly revealed to the FDA about cases of ONJ in the Aredia/Zometa clinical trials. *See* (attached as Exhibit 24).

Dr. Marx's report addresses issues relating to dosing and duration. *See*, *e.g.*, Expert Report of Dr. Robert E. Marx, DDS (Oct. 6, 2008) (attached as Exhibit 25) ("Marx Report") at ¶¶ 42 ("I found that bisphosphonates in question, pamidronate (Aredia) and zoledronate (Zometa), were 1,000 to 10,000 times more potent that the originally marketed bisphosphonate etidronate. Licata 2005."), 48, 53, 54 ("The main finding of [the] study was that the incidence of ONJ was lower in patients treated with the reduced schedule of

bisphosphonate administration, started after the first year of treatment.") (internal citations

omitted).  Notably, Dr. Marx makes the following assertion:

> After this disappointment in trying to get Novartis to acknowledge the drug-induced adverse reaction or to develop serious prevention and treatment protocols, my coworkers and I began notification and prevention activities ourselves.  We collected data from our patient histories and noted the results of different prevention schemes and treatments.  In the meantime, our number of cases kept increasing.  ***We also observed that the severity of cases increased with the number of doses of bisphosphonate received and that more and more cases caused by alendronate (Fosamax) in noncancer patients were being seen.***  Given Novartis' failure to put forth any effective prevention and treatment protocols, we collected our own prevention and treatment data on 119 patients.  This was assembled and coordinated with outcome measurements for a publication.  This article appeared in the November 2005 issue of the Journal of Oral and Maxillofacial Surgery and represented the first comprehensive set of prevention and treatment guidelines for physicians and dentists.  Marx et al. 2005.

*Id.* at ¶ 48 (emphasis added).

Dr. Marx has written multiple books and book chapters on the topic of

Bisphosphonate Induced Osteonecrosis of the Jaw ("BIONJ").  In one, *Oral & Intravenous*

*Bisphosphonate-Induced Osteonecrosis of the Jaws: History, Etiology, Prevention and*

*Treatment*, Dr. Marx discusses dosing and duration issues.  Marx, RE, *Oral & Intravenous*

*Bisphosphonate-Induced Osteonecrosis of the Jaws: History, Etiology, Prevention and*

*Treatment* ("Marx Book"), Quintessence Publishing, Hanover Park, Illinois, 2007, at 49, 60

("the risk of osteonecrosis increases with each dose [of intravenous

bisphosphonate]…current data indicate that intravenous [BIONJ] requires a minimum of 5 to

6 doses before disease occurs), 75-76, 126 ("Knowledge of the type of bisphosphonate used,

the dose, and the duration of exposure is invaluable in assessing the risk of osteonecrosis.")

(excerpts attached as Exhibit 26); see also Marx Report at ¶ 51.  For example, Dr. Marx

shares the following:

13

> The onset of osteonecrosis is related to the potency and half-life of the specific bisphosphonate used. The most potent, Zometa, when administered at the recommended dose of 4 mg per month, may produce exposed bone within 6 to 12 months. An equally potent dose of Aredia (ie, 90 mg per month), if administered on a regular basis, may produce exposed bone in 10 to 16 months.

Marx Book at p. 49 (internal citations omitted). Dr. Marx also touches on intermittent dosing and drug holidays:

> At this writing, studies of the potential benefits of using intermittent dosing and "drug holidays"…are being conducted to evaluate the effect of such a strategy on the size and number of cancer deposits. With the exceedingly long half-life of intravenous bisphosphonates, it is quite possible that a therapeutic level in bone sufficient to control the metastasis can be reached without continuous dosing.

> *Id.* at pp. 75-76.

Doctor Marx's rebuttal report again revisits these issues. See Rebuttal Report of Dr. Robert E. Marx, DDS (Dec. 19, 2008) ("Rebuttal Report") at ¶ 41 (attached as Exhibit 27).

Notably, Dr. Marx draws the following distinction regarding the defense expert report:

> More specific to Mr. Napolitano's case is that Dr. Felsenfeld's report indicated that Mr. Napolitano received Fosamax from November 2002 through January 2005 (26 doses) and that Mr. Napolitano also received Zometa (4 mg) intravenously each month beginning November 11, 2004, for nine total doses. This is more than the threshold dose for [BIONJ]. Dr. Dym fails to understand that when you follow Fosamax with Zometa that they are additive and that Zometa has a greater accumulation in bone and both have a half life in bone of over 11 years, which put Mr. Napolitano at high risk of ONJ.

> *Id.*

Dr. Marx has been deposed in the Aredia/Zometa litigation at least twenty times, and specifically as a case-wide causation expert at least six times. When deposed in 2007, Dr. Marx testified on issues of dosing and duration. See Deposition of Dr. Robert Marx ("Marx Dep."), Vol. 1 (May 15, 2007) at pp. 43:19-22, 46:16-47:19, 48:15-49:21, 49:22-50:4, 50:21-51:22, 52:3-13, 56:1-15, 60:14-25, 97:25-99:6, 100:2-19, 152:10-153:13, 160:17-161:22

(excerpts attached as Exhibit 28); see also Marx Dep., Vol. 2 (May 15, 2007) at pp. 296:1-297:2, 297:23-298:13 (excerpts attached as Exhibit 29); see also Marx Dep., Vol. 3 (May 18, 2007) at pp. 474:16-475:17 (excerpts attached as Exhibit 30); see also Marx Dep., Vol. 4 (May 18, 2007) at pp. 531:22-532:14, 533:19-534:14, 534:23-538:1 (excerpts attached as Exhibit 31).

Later, in 2009, Dr. Marx was again deposed and testified on dosing and duration issues. See Marx Dep., Vol. 5 (Mar. 5, 2009) at pp. 851:2-852:5 (excerpts attached as Exhibit 32); see also Marx Dep., Vol. 7 (May 26, 2009) at pp. 1383:21-1387:13, 1390:12-24 ("There's a reduction in osteonecrosis, according to this article, with reduced dosage of zoledronic acid"), 1393:18-1394:1, 1403:16-1404:6, 1573:1-1574:11, 1576:2-1577:1, 1633:1-1634:8 (excerpts attached as Exhibit 33). Notably, Dr. Marx gives the following testimony, which clearly lays out his opinion on dosing and its relationship to causation:

> [I]t is my contention that the problem with the bisphosphonates is overdosing, and that probably one of the best proof of causation is this. If you've got a drug that produces a side effect and you reduce the exposure to the patient, and the result is there's less of the side effect, that's proof that the drug is actually causing the side effect in the first place.

> *Id.* at pp. 1385:20-1386:2 (Ex. 33).

In fact, in Dr. Marx's very first publication on this issue in a textbook in 2002 he explained that Aredia is more likely to cause BRONJ than other bisphosphonates. Dr. Marx even went as far as to fax a copy of the relevant text book pages to NPC. *See* Facsimile from Dr. Marx to NPC's Brand Safety Leader Dionigi Maladorno (Mar. 27, 2003) (attached as Exhibit 34). Dr. Marx's opinions as to Aredia mirror those of Zometa as his opinions on Aredia emerged first as that drug was on the market first. Dr. Marx arrived at his views of the effects of bisphosphonates on the jaw from Aredia patients. Just as the FDA allowed Novartis to use the clinical trial experience of Aredia to get Zometa on the market faster, Dr.

15

Marx used Aredia in formulating his views about Zometa.  The drugs' main effect and mechanism are the same-they differ mainly in potency.  This does not affect the validity of any opinion of Dr. Marx about Aredia.

Based on the forgoing, the Plaintiffs respectfully request the Court deny Defendant's motion.

**B.     Dr. Suzanne Parisian, M.D.**

Plaintiffs adopt and incorporate by reference the opposition to NPC's *Daubert* motion to exclude Dr. Parisian as filled originally by the Plaintiffs' Steering Committee in the MDL. *See* MDL-1760 Docket No. 2611 (Parisian Opposition) (attached as Exhibit 35).  Plaintiffs will not repeat the substantive arguments as laid out in that filing, but attach the opposition without attachments so that the Court can confirm the near identity of arguments made previously.

With regard to Dr. Parisian as of this date, rulings in nearly thirty cases have admitted her testimony in these BRONJ cases on the adequacy of labels and FDA procedures.  In only one case, where the plaintiff's counsel did not include FDA matters in the pretrial statement and stipulated that FDA and regulatory issues were not at issue in the case, did a court exclude her testimony as irrelevant.  *C.f. Hogan*, 2011 WL 1533457.  Since that ruling, Dr. Parisian has testified in almost a dozen more trials in this litigation.

There have been six separate *Daubert* hearings concerning Dr. Parisian's testimony covering seven cases, including one two-day hearing.  *See Forman*, *supra*.  For all six her testimony was admitted after the hearings.  Should the Court so require, these transcripts can be provided.  Many times qualified, Dr. Parisian as an FDA regulatory expert has been permitted to testify regarding labeling, regulatory compliance, and pharmacovigilance. Novartis rather spends the pages referring to decisions not involving the Zometa litigation, or

opinions like "ghostwriting" and "bad faith" which Plaintiffs do not seek to elicit and which are therefore moot.

Plaintiffs actually intended to offer Dr. Parisian on the four broad areas covered in her expert report, namely: (1) the role, process and functions of the FDA and the responsibilities of pharmaceutical drug sponsors; (2) Novartis' conduct regarding New Drug Application approvals and post-approval of Aredia and Zometa; (3) Novartis' pharmacovigilance efforts, investigation of ONJ and interactions with the FDA; and (4) Novartis' communication of ONJ risks to health care providers. *See Dopson-Troutt, et al. v. Novartis Pharms. Corp.*, 2013 WL 1344755 at *2 (M.D. Fla. Apr. 2, 2013). This Court should follow the well-reasoned opinions of its sister courts allowing Dr. Parisian to testify to the areas on which she is actually proffered. NPC's "fit" argument regarding off-label use of Aredia and Zometa is a red herring. Off-label drug use necessarily implicates the role, process and functions of the FDA and the responsibilities of a pharmaceutical drug sponsor. In addition, NPC's conduct, investigational efforts, and warning efforts are relevant to all those doctors prescribing the drug, even if that prescription is off-label. In fact, one of the reasons that the warnings need to bring home the danger of a prescription drug is because NPC markets the drugs knowing full well that some doctors will use them off-label. It is foreseeable that a doctor looking to strengthen a patient's bones might prescribe Aredia or Zometa even for a patient without bony metastases. NPC's position is that the ***prescribing physician*** is responsible for making a cost-benefit analysis when deciding the recommend Aredia or Zometa. That analysis in this case was skewed because of NPC's inadequate warnings regarding BRONJ.

Regarding Dr. Parisian's so called "regulatory causation opinion", Dr. Parisian has previously been found qualified to testify about what "reasonable evidence of an association

of a serious hazard with a drug" means pursuant to 21 C.F.R. § 210.57. *See*, *e.g.,*

*Zimmerman v. Novartis Pharms. Corp.*, No. 8:08-cv-02089-RWT, Docket No. 180 (D. Md.

Sept. 25, 2012) (Ex. 14).  Plaintiffs intend to offer Dr. Parisian's testimony on this FDA

statute not as evidence of medical causation, but rather as evidence of the reasonableness of

NPC's timing, i.e. when NPC should have adequately warned that Aredia and Zometa cause

BRONJ.

The version of 21 C.F.R. § 210.57 in effect during 2003, when NPC admits it was on

notice of the association of Aredia and Zometa with BRONJ, states the following:

> (e) *Warnings.* Under this section heading, the labeling shall describe serious
> adverse reactions and potential safety hazards, limitations in use imposed by
> them, and steps that should be taken if they occur. The labeling **shall be
> revised to include a warning as soon as there is reasonable evidence of an
> association of a serious hazard with a drug; a causal relationship need
> not have been proved**…

21 C.F.R. § 210.57 (2003) (attached as Exhibit 36).  These words come directly from a FDA

regulation.  They impose a duty on NPC with technical meaning and application.  Thus, it is

critical for the jury to hear from Dr. Parisian what type of evidence the FDA might consider

as being "reasonable evidence of an association of a serious hazard with a drug."  There is no

way for a lay jury to understand what sort of evidence that might be without hearing from an

expert like Dr. Parisian.  It is well within Dr. Parisian's expertise to explain the words of a

FDA regulation to a jury.

In the past Dr. Parisian has educated juries on the statute's meaning by discussing

specific examples of evidence that NPC either admits it knew about, or which it reasonably

should have known about, during the relevant time frame.  *See, e.g., Georges*, 2013 WL

6845987 at *2 (discussing NPC's failure to provide to FDA with an ONJ animal model in its

possession since 1986 and the effect on FDA).  Once a jury has heard from Dr. Parisian

regarding what could potentially be evidence of a "reasonable evidence of an association of a serious hazard with a drug", it can then weigh the evidence available to NPC to determine whether the corporation's response was timely and adequate as a matter of tort law.  Based on the forgoing, the Plaintiffs respectfully request the Court deny Defendant's motion.

**C.    Dr. James Vogel, M.D.**

Plaintiffs adopt and incorporate by reference the opposition to NPC's *Daubert* motion to exclude Dr. Vogel as filled originally by the Plaintiffs' Steering Committee in the MDL. *See* MDL-1760 Docket No. 2528 (Vogel Opposition) (attached as Exhibit 37).  Plaintiffs will not repeat the substantive arguments as laid out in that filing, but attach the opposition without attachments so that the Court can confirm the near identity of arguments made previously.

With regard to Dr. Vogel as of this date, nearly 20 courts have admitted his testimony in these BRONJ cases.  In the past District Courts have held *Daubert* hearings regarding Dr. Vogel's proposed testimony.  The District Court in Arizona held a day long *Daubert* hearing regarding Dr. Vogel's opinions and admitted them, rejecting Novartis' "fit" argument.  *See D'Agnese*, ("...Dr. Vogel's offered opinions regarding the adequacy of defendant's drug labeling, the reduced dosing schedules and information about alternative dosing schedules are not excludable pursuant to the Federal Rules of Evidence 702 and *Daubert*.") (Ex. 16). The Southern District of Florida also held a *Daubert* hearing and allowed Dr. Vogel to testify on the dosing issues, the incident rate of BRONJ, and the biologic mechanism.  *Taylor*, 2013 WL 5118945 at *2-*6.

Nonetheless, Dr. Vogel is a New York hematologist / oncologist of more than forty years' experience.  Dr. Vogel has prescribed Aredia and Zometa.  He has had patients develop BRONJ from these drugs.  His methods, approved by the MDL Court, mirror those

19

of his profession.  Aside from the *D'Agnese* and *Taylor* courts (which have now approved him), no other state or federal court has required a *Daubert* hearing to admit the testimony of this obviously qualified witness whose methods have been approved by the MDL Court.  His opinion is that I.V. bisphosphonates cause BRONJ and do so in relation to the dose given and that Novartis did not timely warn hematologist/oncologists like him of these facts.  *See Monroe*, at pp. 10-12 (Ex. 19).

With regard to the specific arguments raised in Novartis' motion papers, every single one has been addressed by state and federal courts.  Indeed, the MDL Court has already ruled that Dr. Vogel may testify about causation and the adequacy of the warnings.  By and by all of his opinions have been admitted for trial, though Plaintiffs do not intend to solicit "corporate conduct" testimony from Dr. Vogel and that issue is moot.  NPC's fit arguments are not well taken.  That Dr. Vogel is an oncologist does not render his dosing and labeling opinions irrelevant in this case.  Dr. Vogel prescribes the drugs as bone strengtheners, exactly as was done in this case for Mr. Schenk.  If the warnings are inadequate in the context of strengthening bones in cancer patients, the warnings are inadequate in the context of strengthening bones for osteogenesis imperfecta.  Dr. Vogel's dose-response testimony (i.e. that the more bisphosphonate doses, the more likely BRONJ) also does not change depending on the underlying disease for which the bisphosphonates were prescribed. This Court should therefore similarly find Dr. Vogel's qualified and his opinions reliable. Based on the forgoing, the Plaintiffs respectfully request the Court deny Defendant's motion.

**D.      NPC's *Daubert* Motions Are Duplicative, Wasteful, and Unnecessary.**

Despite the clear direction of the MDL Court and the overwhelming weight of the federal remand courts and other courts hearing these cases, once again NPC brings another request to exclude Plaintiffs' case-wide experts.  The real issue before this Court is not the

qualifications of these witnesses or the fit of their testimony, but rather the burdening of this Court with motions that fail to distinguish, or even refer to for that matter, many of the other *Daubert* decisions in this litigation.  By asking this Court to consider its *Daubert* motions, Novartis "is simply trying its hand with a different judge in hopes of changing the outcome." *Deutsch v. Novartis Pharms. Corp.*, 786 F. Supp. 2d 420, 428 (E.D.N.Y. 2011).  This Court should summarily reject this ploy, which itself has already been rejected by most remand courts.  This work is done and should not be repeated.  Again, all of the benefits of an MDL are negated if one party can constantly re-file motions that have been rejected again and again and hope to place the expense and burden of case-wide *Daubert* motions on plaintiffs in all 600 some odd cases that come out of that MDL.

This record more than amply demonstrates there is no need for more *Daubert* briefing in this litigation.  There is no need for further oral argument.  There is a need for promptly proceeding to trial.  This is how the ends of justice can be served.  The Court should be aware that in addition to the nine BRONJ cases against Novartis tried to verdict as of this writing, it is a matter of public record that three cases have settled on the eve of trial.  Over the course of this years-long litigation, only a cutoff of improper and unnecessary duplication and busy work combined with a fixed and firm trial date has focused this Defendant's mind.  Plaintiffs expect this time to be no different.  Plaintiffs respectfully ask the Court to deny NPC's duplicative and unmerited motions in their entirety.

This Court should look at Judge Spatt's determinations in these cases for guidance.  Alone among judges in the federal system he has had three cases trial ready before him.  The *Deutsch* and *Forman/Napolitano* cases were remanded from Wave I-A to the Eastern District of New York.  There, NPC renewed its *Daubert* motions against all of plaintiffs' case-wide experts.  Judge Spatt heard the motions and authored an extensive opinion.  *See Deutsch*, 768

21

F.Supp.2d 420 (nearly 35,500 words spanning almost 64 pages). In his opinion Judge Spatt deemed most of the case-wide expert testimony admissible. He reserved however on the testimony of Dr. Parisian, ordering the parties to appear on April 11, 2011 for a *Daubert* evidentiary hearing. 768 F.Supp.2d at 484. NPC, consistent with the "inconvenience plaintiffs' experts" strategy managed to stretch Dr. Parisian's *Daubert* hearing to two days (April 11, 2011 and May 2, 2011). At its conclusion, Judge Spatt wrote an additional opinion admitting the majority of Dr. Parisian's testimony. *See Forman*, 2011 WL 2516527. These two opinions should have settled NPC's case-wide *Daubert* motions within the Second Circuit.

Yet later, when the *Davids* case was also remanded to the Eastern District of New York before Judge Spatt, NPC again moved to exclude plaintiff's case-wide experts. Apparently, all that work did not even settle the matter before Judge Spatt. This, before the same Judge that wrote the definitive opinion to date on the topics and held a two day *Daubert* hearing on Dr. Parisian. Judge Spatt responded with the following:

> Despite the clear, definitive rulings by both this Court and the MDL court, Novartis again moves to exclude the expert testimony in whole or in part of the following case-wide experts: (1) Dr. Keith Skubitz; (2) Professor Wayne Ray; (3) Dr. Suzanne Parisian; (4) Dr. James Vogel; and (5) Dr. Robert Marx....
>
> It is not apparent to the Court what "considerable pains" the Defendant undertook to differentiate the *Daubert* motions in *Davids* from those that were before the Court in *Deutsch* and *Forman*....as with the motions previously before the Court, the Defendant primarily objects to each expert's methodology and qualifications to render opinions on particular issues of causation or the Defendant's conduct. Although the Court respects the Defendant's right to preserve all relevant issues for appeal, the Court sees no basis to deviate from its holdings in the *Deutsch Daubert Order* and subsequent *Parisian Daubert Order* with respect to the case-wide experts.
>
> Accordingly, the Court adopts its rulings as set forth in the *Deutsch Daubert Order* and *Parisian Daubert Order* with respect to the admissibility of the expert testimony of: (1) Dr. Keith Skubitz; (2) Professor Wayne Ray; (3) Dr. Suzanne Parisian; (4) Dr. James Vogel; and (5) Dr. Robert Marx. To the extent

any of these experts seek to render opinions on issues that are unrelated to the facts of the Plaintiff's case, the Defendant may raise such objections at the trial. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 591, 113 S.Ct. 2786, 2795–96, 125 L.Ed.2d 469 (1993) ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.")

*Davids*, 857 F.Supp.2d 267, 275-76. *See also Rutz*, at p. 4 ("The motions to exclude testimony of Plaintiff's retained experts were transferred to this Court by the MDL court, and NPC continues to pursue them even though there were clear, definitive rulings by the MDL court (and, subsequently, numerous district courts) regarding these same experts.") (Ex. 15).

NPC has requested and received *Daubert* hearings in *Forman* (on Dr. Parisian), *Lemons (Talley)* (on Drs. Marx and Parisian), *Kyle-Mahaney* (on Dr. Parisian), *Jenkins* (on Drs. Marx and Parisian), *D'Agnese* (on Dr. Vogel) and *Taylor* (on Dr. Parisian and Dr. Vogel). Analogous hearings were held for all of Plaintiffs' experts in *Bessemer* (under stricter New Jersey rules of evidence). None of the experts' proposed testimony has changed, ever, and applies to all cases. At the very least, there is no need to hold additional evidentiary hearings when the parties can provide copies of full transcripts from prior evidentiary hearings.

Additional motion practice cannot assist the Court. The MDL-1760 court has already ruled on Drs. Marx and Vogel. *See Deutsch*, 768 F.Supp.2d at 427-28. So too has Judge Spatt, twice. Judge Spatt is most intimate with these cases on remand, and has commented on the endless paper and motion practice. Those remarks were not to the effect that it was helpful. *See Davids v. Novartis Pharms. Corp.*, No. 2:06-cv-0431, Trial Tr., 1855:6-22 (E.D.N.Y. Oct. 22, 2012) (attached as Exhibit 38). The comments of Judge Adams, presiding over a case in the Middle District of Florida, echo those of Judge Spatt. There have been many, many decisions on the case-wide experts in these cases. It would be most efficient to simply decide these motions on the papers. Plaintiffs can, should the Court deem

23

it necessary, submit transcripts of prior *Daubert* hearings.  But even that seems wasteful in the fact of prior decisions from across the country.

## CONCLUSION

Plaintiffs' case-wide experts have been approved to testify in Aredia/Zometa cases in scores of federal and state courts across the country.  Dr. Marx and Dr. Parisian have testified in virtually every Aredia/Zometa trial.  NPC's *Daubert* motions are not well taken generally; its objections go to the substance of the expert testimony not its admissibility.  Such objections are more akin to motions *in limine* that would best be dealt with at the trial of this matter.  NPC's motions should be denied in their entirety.

Dated:  July 17, 2014                                  Respectfully Submitted,

/s/ John J. Vecchione
John J. Vecchione, Esq. (admitted *pro hac vice*)
John J. Vecchione Law, PLLC
3863 Plaza Drive
Fairfax, Virginia 22030
Telephone:  (703) 352-4800
Facsimile:  (703) 352-4820
jvecchione@valadlaw.com

-with-

Martin H. Mathers, Esq.
Martin H. Mathers PC
3101 N. Central Ave., Ste. 970
Phoenix, Arizona 85012
Telephone:  (602) 258-0646
Facsimile:  (602) 258-8287
mathers@gmazlaw.com

*Counsel for Plaintiffs*
*Paul and Gail Schenk*

24

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 17, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Katharine R. Latimer, Esq.
Bruce Berger, Esq.
Patrick R. Harkins, Esq.
HOLLINGSWORTH LLP
1350 I Street NW
Washington, DC  20005
Telephone: 202-898-5800
Facsimile: 202-682-1639
klatimer@hollingsworthllp.com
pharkins@hollingsworthllp.com

Thomas M. Hoidal
Law Office of Thomas M. Hoidal PLC
7227 N. 16th St., Ste. 222
Phoenix, AZ 85020
Telephone: 602-254-0202
Facsimile: 602-254-0404
thoidal@hoidallawoffice.com

*Counsel for Defendant Novartis
Pharmaceuticals Corporation*

/s/ John J. Vecchione
John J. Vecchione, Esq. (admitted *pro hac vice*)